1

2

3

4                    **UNITED STATES DISTRICT COURT**

5                         **DISTRICT OF NEVADA**

6    CHRISTOPHER O'NEILL                    3:12-cv-00091-RCJ-WGC

7                              Plaintiff,    <u>**REPORT & RECOMMENDATION OF**</u>
                                             <u>**U.S. MAGISTRATE JUDGE**</u>
8         v.

9    ROBERT BANNISTER, et. al.

10                            Defendants.

11

12        This Report and Recommendation is made to the Honorable Robert C. Jones, United

13   States District Judge. The action was referred to the undersigned Magistrate Judge pursuant to 28

14   U.S.C. § 636(b)(1)(B) and the Local Rules of Practice, LR 1B 1-4.

15        Before the court is Defendants' Motion for Summary Judgment. (Doc. # 54.)[1] Plaintiff

16   filed an opposition (Doc. # 58)[2] and Defendants filed a reply (Doc. # 62).

17        After a thorough review, the court recommends that Defendants' motion be granted in

18   part and denied in part.

19                            **I. BACKGROUND**

20        At all relevant times, Plaintiff Christopher O'Neill was in custody of the Nevada

21   Department of Corrections (NDOC). (Pl.'s Am. Compl., Doc. # 38.) Plaintiff, a pro se litigant,

22   brings this action pursuant to 42 U.S.C. § 1983. (*Id.*) The events giving rise to this litigation took

23   place while Plaintiff was housed at Nevada State Prison (NSP), Northern Nevada Correctional

24   Center (NNCC) and Ely State Prison (ESP). (*Id.*) Defendants are NDOC's former Medical

25   _____

26        [1] Refers to court's docket number. Unless otherwise noted, all page number references are to the court's
     docketed page numbers.

27
          [2] Plaintiff's opposition consists of his memorandum of points and authorities (Doc. # 58 at 1-16) and a
28   voluminous amount of exhibits (Doc. # 58 at 17-100, Doc. # 58-1 at 1-87, Doc. # 58-2 at 1-101, and Doc. # 58-3 at
     1-48).

1    Director Dr. Robert Bannister, Nurse Sharon Koster, Dr. Karen Gedney, Dr. Marsha Johns,

2    Dr. Michael Koehn, Dr. David Mar, former NNCC Director of Nursing John Peery, and Nurse

3    Charles "Shilo" Reeves. (*Id.*)

4          After his complaint was screened, Plaintiff was allowed to proceed with the following

5    claims under the Eighth Amendment: (1) alleged sexual misconduct against Dr. Mar;

6    (2) deliberate indifference to his serious medical needs against defendants Dr. Mar, Dr. Gedney,

7    John Peery, Dr. Johns, Dr. Bannister, and Shiloh Reeves, related to medical care at NNCC

8    between August 2010 and February 2011; (3) deliberate indifference to a serious medical need

9    against defendant Dr. Koehn for medical care at ESP between March 1, 2011 and March 30,

10   2011; (4) deliberate indifference to a serious medical need against defendants Dr. Gedney,

11   Dr. Johns, John Peery, and Nurse Koster related to medical care at NNCC between March 31,

12   2011 and August 8, 2011; and (5) deliberate indifference to a serious medical need against

13   defendants Dr. Koehn and Dr. Mar related to medical care at ESP between August 9, 2011 and

14   January 30, 2012. (Screening Order, Doc. # 7; Am. Compl., Doc. # 38.)

15         Defendants move for summary judgment arguing that Dr. Mar did not engage in any

16   sexual misconduct with Plaintiff and that none of the defendants was deliberately indifferent to

17   Plaintiff's serious medical need. (Doc. # 54.)

18                              **II. LEGAL STANDARD**

19         "The purpose of summary judgment is to avoid unnecessary trials when there is no

20   dispute as to the facts before the court." *Northwest Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18

21   F.3d 1468, 1471 (9th Cir. 1994) (citation omitted). In considering a motion for summary

22   judgment, all reasonable inferences are drawn in favor of the non-moving party. *In re Slatkin*,

23   525 F.3d 805, 810 (9th Cir. 2008) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255

24   (1986)). "The court shall grant summary judgment if the movant shows that there is no genuine

25   dispute as to any material fact and the movant is entitled to judgment as a matter of law."

26   Fed. R. Civ. P. 56(a). On the other hand, where reasonable minds could differ on the material

27   facts at issue, summary judgment is not appropriate. *See Anderson v. Liberty Lobby, Inc.*, 477

28   U.S. 242, 250 (1986).

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1)(A), (B).

If a party relies on an affidavit or declaration to support or oppose a motion, it "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

In evaluating whether or not summary judgment is appropriate, three steps are necessary: (1) determining whether a fact is material; (2) determining whether there is a genuine dispute as to a material fact; and (3) considering the evidence in light of the appropriate standard of proof. *See Anderson*, 477 U.S. at 248-250. As to materiality, only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment; factual disputes which are irrelevant or unnecessary will not be considered. *Id.* at 248.

In deciding a motion for summary judgment, the court applies a burden-shifting analysis. "When the party moving for summary judgment would bear the burden of proof at trial, 'it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial.'...In such a case, the moving party has the initial burden of establishing the absence of a genuine [dispute] of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (internal citations omitted). In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *See Celotex Corp. v. Cartrett*, 477 U.S. 317, 323-25 (1986).

1   If the moving party satisfies its initial burden, the burden shifts to the opposing party to

2   establish that a genuine dispute exists as to a material fact. *See Matsushita Elec. Indus. Co. v.*

3   *Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). To establish the existence of a genuine dispute of

4   material fact, the opposing party need not establish a genuine dispute of material fact

5   conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a

6   jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv.,*

7   *Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (quotation marks and

8   citation omitted). The nonmoving party cannot avoid summary judgment by relying solely on

9   conclusory allegations that are unsupported by factual data. *Id*. Instead, the opposition must go

10  beyond the assertions and allegations of the pleadings and set forth specific facts by producing

11  competent evidence that shows a genuine dispute of material fact for trial. *Celotex*, 477 U.S. at

12  324.

13   That being said, ]

14   [i]f a party fails to properly support an assertion of fact or fails to properly address
     another party's assertion of fact as required by Rule 56(c), the court may: (1) give

15   an opportunity to properly support or address the fact; (2) consider the fact
     undisputed for purposes of the motion; (3) grant summary judgment if the motion

16   and supporting materials—including the facts considered undisputed—show that
     the movant is entitled to it; or (4) issue any other appropriate order.

17

18  Fed. R. Civ. P. 56(e).

19   At summary judgment, the court's function is not to weigh the evidence and determine

20  the truth but to determine whether there is a genuine dispute of material fact for trial. *See*

21  *Anderson*, 477 U.S. at 249. While the evidence of the nonmovant is "to be believed, and all

22  justifiable inferences are to be drawn in its favor," if the evidence of the nonmoving party is

23  merely colorable or is not significantly probative, summary judgment may be granted. *Id*. at 249-

24  50 (citations omitted).

25   **III. DISCUSSION**

26  **A. Preliminary Matters**

27   In Plaintiff's opposition to Defendants' motion, he includes one paragraph where he states

28  that he was unable to directly contact Dr. Grimes (the pain specialist who treated him), his

1    treating neurologist and a litany of fifty other potential witnesses due to the court's denial of

2    "access to the discovery process" and the Defendants' denial of access to legal research materials.

3    (Doc. # 58 at 14.)

4          Plaintiff provides no other details regarding this issue. Nor does he specifically address

5    whether or how this precluded him from adequately addressing Defendants' motion. The

6    voluminous exhibits accompanying Plaintiff's opposition include a motion Plaintiff filed on

7    April 1, 2013 (Doc. # 35), where he argued that he was not being allowed to obtain the names of

8    other prisoners who may have been witnesses to some of the incidents alleged to violate the

9    Constitution in his complaint. He also asked for the contact information of NDOC staff members

10   who he claimed were witnesses. Defendants opposed that motion. (Doc. # 39.)

11         In its order addressing that motion, the court advised Plaintiff that to the extent he was

12   seeking to obtain discovery, he was permitted to proceed in accordance with the Federal Rules of

13   Civil Procedure. (Order at Doc. # 47.) The court declined, however, to sua sponte interject itself

14   and order Defendants to undertake an investigation and produce information that had not yet

15   been properly requested of them via the discovery process.

16         The court did not hear anything further from Plaintiff on the issue of discovery. For

17   example, he did not file a motion to compel indicating that Defendants failed to provide him with

18   information requested through discovery or contend that their responses to discovery were

19   insufficient. With respect to third party witnesses, Plaintiff had at his disposal the tools set forth

20   in the Federal Rules of Civil Procedure, including Rule 45, which is the mechanism for a litigant

21   to obtain information from a third-party witness. While Plaintiff concludes that the court denied

22   him access to the discovery process, he does not indicate that he attempted to serve the

23   Defendants with discovery. Nor does he state that he attempted to serve third-party witnesses,

24   including Dr. Grimes, with a subpoena.

25         Nor did he file a motion asking the court to defer consideration of Defendants' motion or

26   deny it under Federal Rule of Civil Procedure 56(d) which allows the court to undertake such

27   action if a party shows an inability to present facts essential to justify an opposition to a motion

28   for summary judgment. Fed. R. Civ. P. 56(d).

- 5 -

Plaintiff's opposition does include a copy of a March 3, 2013, request to be transported to NSP to inspect, measure and photograph the Unit 12 medical exam room. (Doc. # 58 at 54.) Defendants responded in a letter that "such an excursion would be unnecessary" and advised him that "[e]ven if [he] were to demonstrate the slightest need [to inspect the room], it would be incumbent on [Plaintiff] to pay for the expense of transporting [Plaintiff] to NSP, and then back to ESP." (*Id.* at 56.)

The only incident in the complaint that occurred at NSP (an NDOC facility that has been closed since May 18, 2012) is the alleged sexual misconduct by Dr. Mar on April 15, 2010. (Doc. # 38 at 6.) Plaintiff presumably wanted this information to rebut Dr. Mar's claim that when he examined Plaintiff there were generally two correctional officers and a nurse present, by showing that those people could not fit in the examination room.

First, if Plaintiff was dissatisfied with Defendants' response, his remedy was to bring a timely motion to compel. He did not do so. In addition, the court has found, *infra*, that a genuine dispute of material fact exists such that Dr. Mar's motion for summary judgment related to the sexual misconduct allegation should be denied. Incidentally, instead of sending a request to inspect the room to prison officials, Plaintiff could have sent Dr. Mar an interrogatory regarding the dimensions of the room. Moreover, the dimensions of the room are not material to Plaintiff's claim. Instead, the material dispute raised by Plaintiff is as to what Dr. Mar did during his examination of Plaintiff and whether such conduct violates the Eighth Amendment. Therefore, to the extent Plaintiff is arguing that he should be able to conduct discovery on this issue prior to responding to Defendants' motion, his argument is not well taken.

In sum, to the extent Plaintiff's opposition and accompanying exhibits can be construed as a request to defer consideration of Defendants' motion for summary judgment or to deny it so that he can obtain discovery, that request should be denied. Plaintiff has failed to set forth in affidavit form the specific facts he hopes to elicit from discovery, that the facts exist, and that they are essential to opposing the motion for summary judgment. *See Family Home and Finance Center, Inc. v. Federal Home Loan Mortg. Corp.*, 525 F.3d 822, 827 (9th Cir. 2008) (citation omitted). Failure to make this showing "is a proper ground for denying discovery and proceeding

1   to summary judgment." *Id.* (citation and quotation marks omitted).

2   **B. Sexual Misconduct Claim against Dr. Mar**

3       Plaintiff claims that several of Dr. Mar's examinations of Plaintiff amount to sexual

4   misconduct in violation of the Eighth Amendment's prohibition on cruel and unusual

5   punishment. (Doc. # 38 at 6.)

6       The Eighth Amendment prohibits cruel and unusual punishment in penal institutions.

7   Whether a specific act constitutes cruel and unusual punishment is measured by "the evolving

8   standards of decency that mark the progress of a maturing society." *Hudson v. McMillian*, 503

9   U.S. 1, 8 (1992). Sexual harassment or abuse of an inmate by a prison official violates the Eighth

10  Amendment. *See Schwenk v. Hartford*, 204 F.3d 1187, 1196-97 (9th Cir. 2000) ("In the simplest

11  and most absolute of terms...prisoners [have a clearly established Eighth Amendment right] to be

12  free from sexual abuse...") *see also Women Prisoners of the Dist. of Columbia Dep't of Corr. v.*

13  *Dist. of Columbia*, 877 F. Supp. 634, 665 (D.D.C. 1994) (quoting *Farmer v. Brennan*, 511 U.S.

14  825, 834 (1994)), *aff'd in part and vacated in part*, 93 F.3d 901 (D.C. Cir. 1996) ("[U]nsolicited

15  touching of...prisoners' [genitalia] by prison employees [is] 'simply not part of the penalty that

16  criminal offenders pay for their offenses against society.'").

17      Plaintiff alleges that on April 15, 2010, he was seen in the medical exam room at NSP to

18  be examined by Dr. Mar for complaints of pain in his back, groin and stomach. (*Id.*) Plaintiff

19  contends that what actually occurred is that Dr. Mar began "massaging [his] leg, testicles, and

20  penis" and "began to shake [his] penis back and forth," and Plaintiff yelled at him to stop and

21  told Dr. Mar he had gone too far. (Doc. # 38 at 6.)

22      Then, on November 29, 2011, Plaintiff alleges that he saw Dr. Mar again and tried to gain

23  assurances that Dr. Mar would only be examining Plaintiff's back, to which he agreed.

24  (Doc. # 38 at 12.) Plaintiff contends, however, that halfway through the examination Dr. Mar

25  grabbed the front of Plaintiff's waistband and looked down at his genitals. (*Id.*)

26      Dr. Mar has submitted a declaration in support of his motion for summary judgment and

27  in opposition to Plaintiff's allegations. (Mar Decl., Doc. # 55-1.) He recalls examining Plaintiff

28  on several occasions, and states that due to Plaintiff's custody status, he usually saw Plaintiff in

1    an examination room within the lockdown unit, accompanied by two correctional officers and a

2    nurse. (Mar Decl., Doc. # 55-1 at 3 ¶ 12.) Dr. Mar can only recall one occasion when he did not

3    see Plaintiff in a lockdown facility and that was when he saw Plaintiff at NNCC's Regional

4    Medical Facility (RMF), and on that occasion he asked Correctional Officer Escobar to

5    accompany him to the examination. (*Id*.)

6         According to Dr. Mar, when he saw Plaintiff on April 15, 2010, it was because Plaintiff

7    was complaining of pain on the right side of his abdomen which radiated to his groin, and he also

8    had an inguinal hernia. (*Id*. ¶ 13.) He recalls that correctional officers along with Nurse Sheela

9    Barth were present at this examination. (*Id*. at 4 ¶ 14.) Dr. Mar claims that pursuant to his

10   training and experience he proceeded to perform a scrotal check on Plaintiff which involved him

11   "taking [his] fingers and probing [Plaintiff's] scrotal sack and placing [his] fingers in the inguinal

12   canal" and having Plaintiff cough "to see if abdominal lining came down into his inguinal canal."

13   (*Id*. ¶ 15.) It was Dr. Mar's opinion after conducting the examination that Plaintiff's complaints

14   were inconsistent with Dr. Mar's observations. (*Id*. ¶ 17.) Despite his doubts, Dr. Mar scheduled

15   Plaintiff for a surgical consult. (*Id*. ¶ 18.)

16        Next, Dr. Mar indicates that he reviewed his progress notes from Plaintiff's

17   November 29, 2011 examination—the other occasion where Plaintiff alleges Dr. Mar engaged in

18   sexual misconduct. (*Id*. ¶ 20.) He noted that he examined Plaintiff for lower back pain on that

19   date. (*Id*.) He goes on to state that while it is not reflected in the progress notes, he "probably

20   would have lifted Mr. O'Neill's boxers while [he] palpated [Plaintiff's] stomach to see if there

21   were any masses, bumps and/or lesions below his waist line due to his prior hernia history..." (*Id*.

22   at 5 ¶ 21.)

23        Dr. Mar maintains that his examinations were consistent with his training and experience

24   and were done for the sole purpose of determining the source and cause of Plaintiff's alleged

25   pain. (*Id*. ¶ 22.) Dr. Mar also notes that the Nevada Board of Medical Examiners investigated

26   Plaintiff's complaints of sexual misconduct/harassment and determined them to be unfounded.

27   (*Id*. ¶ 23.)

28        In support of his motion, Dr. Mar also provides the declaration of Correctional Officer

1   Whittington, whom Plaintiff contends was aware of the alleged sexual misconduct. (Doc # 54-3
2   at 2-4.) Correctional Officer Whittington acknowledges that he escorted Plaintiff to an
3   examination room to receive medical care from Dr. Mar, but denies having had a conversation
4   with Plaintiff regarding the manner in which Dr. Mar conducted his examination or regarding
5   any alleged inappropriate conduct during the examination. (*Id*.) He similarly denies ever having
6   observed such conduct. (*Id*.)

7       Dr. Mar then provides a similar declaration from Correctional Officer Bradley, whom
8   Plaintiff also claims was present during the alleged misconduct on November 20, 2011. (Doc.
9   # 54-4.) Correctional Officer Bradley recalls Plaintiff and the examination, and states that he was
10  required to prepare a report regarding Plaintiff's complaints following the examination. (*Id*.) He
11  reviewed his report where he stated that he observed the examination, where Dr. Mar pressed on
12  Plaintiff's stomach while lifting up his waistband and looking at Plaintiff's genitals; however, he
13  states he did not observe Dr. Mar reach into Plaintiff's boxers or touch, grab or fondle Plaintiff's
14  genitals. (*Id*.)

15      Plaintiff disputes Dr. Mar's position. Plaintiff maintains that the first examination, in
16  April 2010, crossed the line from appropriate to inappropriate when Dr. Mar massaged Plaintiff's
17  genitals in a sexual manner. (Doc. # 58 at 2, 8-9.) With respect to the second examination,
18  Plaintiff is adamant that Dr. Mar pulled back his waistband and looked at his genitals, without
19  Plaintiff's permission, and this conduct was inappropriate under the circumstances. (*Id*. at 9.) In
20  support of his position, he submits grievance documentation where he asserted that he had been
21  repeatedly sexually assaulted by Dr. Mar during medical examinations. (Doc. # 54-2 at 3-15;
22  Doc. # 58 at 80-92.) The details relayed in the grievances are consistent with his claims in this
23  action.

24      Dr. Mar has provided evidence in support of his position that his examinations of
25  Plaintiff on April 15, 2010 and November 29, 2011 were at all times professional, medically
26  appropriate and consistent with his training and experience in determining the source and cause
27  of Plaintiff's pain. Plaintiff, on the other hand, has provided evidence that Dr. Mar's conduct on
28  these two occasions exceeded the bounds of appropriate care for a physician and went into the

realm of that which is inappropriate and violative of the Eighth Amendment. As such, Plaintiff has raised a genuine dispute of material fact as to his claim for sexual misconduct against Dr. Mar. It is the province of the fact-finder to determine which version of events to believe. *See Furnace v. Sullivan,* 705 F.3d 1021, 1026 (9th Cir. 2013) (in reviewing summary judgment motion, the court must "assume the truth of the evidence set forth by the nonmoving party"). Therefore, Dr. Mar's motion for summary judgment should be denied as to Plaintiff's claim that Dr. Mar violated the Eighth Amendment by engaging in alleged sexual misconduct on April 15, 2010 and November 29, 2011.

**C. Deliberate Indifference to a Serious Medical Need**

   **1. Legal Standard**

A prisoner can establish an Eighth Amendment violation arising from deficient medical care if he can prove that prison officials were deliberately indifferent to a serious medical need. *Estelle v. Gamble,* 429 U.S. 97, 104 (1976). "The requirement of deliberate indifference is less stringent in cases involving a prisoner's medical needs than in other cases involving harm to incarcerated individuals because '[t]he State's responsibility to provide inmates with medical care ordinarily does not conflict with competing administrative concerns.'" *McGuckin v. Smith*, 974 F.2d 1050, 1060 (9th Cir. 1992), *rev'd on other grounds, WMX Tech, Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997). "In deciding whether there has been deliberate indifference to an inmate's serious medical needs, [the court] need not defer to the judgment of prison doctors or administrators." *Hunt v. Dental Dep't*, 865 F.2d 198, 200 (9th Cir. 1989).

A claim for deliberate indifference involves the examination of two elements: "the seriousness of the prisoner's medical need and the nature of the defendant's response to that need." *McGuckin*, 974 F.2d at 1059; *see also Akhtar v. Mesa*, 698 F.3d 1202, 1213 (9th Cir. 2012) (quoting *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006)). "A 'serious' medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" *McGuckin*, 974 F.2d at 1059 (citing *Estelle*, 429 U.S. at 104); *see also Akhtar*, 698 F.3d at 1213. Examples of conditions that are "serious" in nature include "an injury that a reasonable doctor or patient would find important and worthy of

comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *McGuckin*, 974 F.2d at 1059-60; *see also Lopez v. Smith*, 203 F.3d 1122, 1131 (9th Cir. 2000) (citation omitted) (finding that inmate whose jaw was broken and mouth was wired shut for several months demonstrated a serious medical need).

If the medical need is "serious," the plaintiff must show that the defendant acted with deliberate indifference to that need. *Estelle*, 429 U.S. at 104; *Akhtar*, 698 F.3d at 1213 (citation omitted). "Deliberate indifference is a high legal standard." *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004). Deliberate indifference entails something more than medical malpractice or even gross negligence. *Id.* Inadvertence, by itself, is insufficient to establish a cause of action under section 1983. *McGuckin*, 974 F.2d at 1060. Instead, deliberate indifference is only present when a prison official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *see also Akhtar*, 698 F.3d at 1213 (citation omitted).

Deliberate indifference exists when a prison official "den[ies], delay[s] or intentionally interfere[s] with medical treatment, or it may be shown by the way in which prison officials provide medical care." *Crowley v. Bannister*, 734 F.3d 967, 978 (9th Cir. 2013) (internal quotation marks and citation omitted).  "'[A] prisoner need not prove that he was completely denied medical care' in order to prevail" on a claim of deliberate indifference. *Snow v. McDaniel*, 681 F.3d 978, 987 (9th Cir. 2012) (quoting *Lopez*, 203 F.3d at 1132), *overruled on other grounds*, *Peralta v. Dillard*, 744 F.3d 1076, 1083 (9th Cir. 2014). Where delay in receiving medical treatment is alleged, a prisoner must demonstrate that the delay led to further injury. *McGuckin*, 974 F.2d at 1060.

"A difference of opinion between a physician and the prisoner—or between medical professionals—concerning what medical care is appropriate does not amount to deliberate indifference." *Snow*, 681 F.3d at 987 (citing *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989)). Instead, to establish deliberate indifference in the context of a difference of opinion between a

1    physician and the prisoner or between medical providers, the prisoner "'must show that the

2    course of treatment the doctors chose was medically unacceptable under the circumstances' and

3    that the defendants 'chose this course in conscious disregard of an excessive risk to plaintiff's

4    health.'" *Snow*, 681 F.3d at 988 (quoting *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996)).

5          **2. Summary of Argument**

6          Defendants maintain that Plaintiff's allegations that Defendants ignored his complaints of

7    pain, denied him medical care or treatment or provided improper care or treatment are belied by

8    his medical records. (Doc. # 54 at 12-14.) They contend that during the relevant time period,

9    Plaintiff received substantial medical care and treatment for various issues, including

10    consultations and examinations with NDOC physicians and staff and with private care providers,

11    monitoring of his medical issues, injections, surgery, and prescriptions for various drugs to

12    address his complaints of pain, nausea and elevated blood pressure. (*Id*. at 14.)  In support of

13    their motion, they provide Plaintiff's relevant medical progress notes, physicians' orders, and

14    unusual occurrence reports, along with a transcription of those documents. (*See* Doc. # 55.) In

15    addition, they have provided a declaration of Dr. Koehn, a defendant and Senior Physician at

16    ESP, in response to Plaintiff's allegations that NDOC medical personnel have refused to issue

17    pain medication or provide him with medical care. (Doc. # 55-4.)

18          In response, Plaintiff argues that various disputed facts exist that preclude the entry of

19    summary judgment in favor of Defendants. (Doc. # 58.) He claims to suffer from chronic pain

20    and contends that Defendants failed to adequately treat him and as such were deliberately

21    indifferent to his serious medical needs. (*Id*.) In support of his opposition, he provides his own

22    declaration, which is virtually identical to his amended complaint. (Doc. # 58 at 18-26.) He also

23    provides: additional medical records, grievance documentation, kites and correspondence

24    regarding medical issues (Doc. # 58 at 28-34, 80-100; Doc. # 58-1 at 1-6, 40-87; Doc. # 58-2 at

25    1-4, 19-79, 81-101; Doc. # 58-3 at 1-48); his "yard time logs" (Doc. # 58-1 at 7-39); various

26    discovery filings in this action (Doc. # 58 at 35-71; Doc. # 58-2 at 6-18); Administrative

27    Regulations (ARs) (Doc. # 58 at 72-79); the affidavit of Raymond Baca (Doc. # 58-2 at 79); and

28    the affidavit of Michael Stringer (Doc. # 58-2 at 80).

1    The court will now address each of Plaintiff's claims for deliberate indifference under the

2    Eighth Amendment, in chronological order, as they are alleged in the amended complaint.

3    **3. August 2010 through February 2011—Dr. Mar, Dr. Gedney, Nurse Peery,**

4    **Dr. Johns, Dr. Bannister, Nurse Reeves**

5    **a. Dr. Mar**

6    Plaintiff alleges that on September 12, 2010, when Nurse Reeves responded to a "man

7    down" called by Plaintiff, Nurse Reeves told Plaintiff that Dr. Mar had said Plaintiff was not to

8    receive any care. (Doc. # 38 at 7 ¶ 5.) He also avers that Dr. King told him that both Dr. Gedney

9    and Dr. Mar told him they did not want Plaintiff to receive anything for his pain. (Doc. # 38 at 8

10   ¶ 14.)

11   Even taking as true the allegation that Dr. Mar told Nurse Reeves and Dr. King that

12   Plaintiff should not receive any medical care or pain treatment, Plaintiff's medical records are

13   flush with evidence to the contrary and demonstrate this is not what occurred. In fact, Plaintiff

14   did receive medical care in connection with the incident on September 12, 2010, and continued

15   to receive care from medical staff at NNCC. (*See* Doc. # 58-3 at 27; Doc. # 58-2 at 9, 37; Doc.

16   # 55-2 at 9, 29-10; Doc. # 5-2 at 30, 37; Doc. # 58-3 at 26.) Plaintiff likewise received a variety

17   of medications to address his complaints of pain during this time period. (*Id.*) There is no

18   evidence that Dr. Mar acted with deliberate indifference by knowingly disregarding a serious risk

19   to Plaintiff's health. Instead, the evidence before the court indicates that Plaintiff was provided

20   with responsive care to his complaints of pain when he was seen by various health care providers

21   and prescribed a variety of medications. Therefore, summary judgment should be granted in

22   Dr. Mar's favor as to Plaintiff's claim that Dr. Mar was deliberately indifferent to a serious

23   medical need during this time period.

24   **b. Dr. Gedney**

25   Plaintiff contends that following his surgery he saw Dr. Gedney on August 30, 2010.

26   (Doc. # 38 at 7 ¶ 3.) He claims that when she saw he had tattoos, she told him that she would not

27   give someone like him anything that would make him feel better. (*Id.*) He asserts that he begged

28   her for help, and in response she said she would give him "something," and then he was

- 13 -

1    discharged from the RMF the following day. (*Id.*)

2         Even crediting the statement about the tattoos as true, Dr. Gedney did not live up to her

3    alleged statement. Instead, she provided Plaintiff with continual care during this time period. She

4    saw Plaintiff and examined him on many occasions. (Doc. # 55-2 at 7-11, 29-31.) She prescribed

5    him pain medication when indicated (narcotic and non-narcotic), referred him to specialists, and

6    consistently monitored his care. (*Id.*) Moreover, while Plaintiff attributes his discharge from the

7    infirmary to Dr. Gedney not wanting to provide him with care, his medical records suggest that

8    he received continual care and medication during this period of time. (*Id.*)

9         Next, Plaintiff claims that when he asked a nurse about his medication, he was told he

10   was not on pain medication but psychiatric drugs and seizure medication, including Elavil, to

11   which he claims he has an allergy. (*Id.* at 7 ¶ 4.) He claims Dr. Gedney knew he was allergic to

12   this medication, and gave it to him maliciously in order to make him sick. (*Id.*) This contention is

13   belied by Plaintiff's medical records. Plaintiff has produced no evidence to support the assertion

14   that Dr. Gedney purposefully prescribed him a medication she knew he was allergic to in order

15   to cause him harm. Instead, the records indicate that Plaintiff saw Dr. Gedney on August 23,

16   2010, and she noted Plaintiff had seen Dr. King who thought Plaintiff had a possible nerve

17   entrapment. (Doc. # 55-2 at 7.) She prescribed him Tylox every four to six hours as needed for

18   his pain, as well as Elavil and ibuprofen and scheduled Plaintiff for an ultrasound. (*Id.*, 29.) The

19   following day, Plaintiff reported that the Elavil was not helping his pain and made him feel

20   "foggy", and the order for the drug was promptly discontinued. (*Id.*) There is no indication

21   Dr. Gedney had advance knowledge of any allergy to Elavil when it was prescribed. When the

22   drug was discontinued she tried him on another drug to address his probable nerve entrapment

23   pain.

24        Plaintiff then alleges that he saw his surgeon, Dr. King, on September 13, 2010, who said

25   Dr. Gedney had advised him that Plaintiff should not be prescribed pain medication because it

26   was not working. (*Id.* at 7 ¶ 6.) Plaintiff claims he told Dr. King this was a lie, but Dr. King said

27   he could not do anything for Plaintiff without Dr. Gedney's approval. Plaintiff then alleges that

28   he saw Dr. King again on December 13, 2010, who told him that Dr. Gedney and Dr. Mar did

not want Dr. King to give Plaintiff anything for his pain. (*Id.* at 8 ¶ 14.) He saw Dr. King next on February 14, 2011, and received injections, but Dr. King told him that Dr. Gedney would not allow him to see a pain specialist. (*Id.* ¶ 15.)

Again, these allegations are not supported by Plaintiff's medical records. Plaintiff was seen by Dr. King on multiple occasions. In addition, Dr. Gedney prescribed Plaintiff pain medication on a consistent basis following his complaints of pain. She referred him to specialists when warranted. In addition, her progress notes indicate that she acknowledged Dr. King's findings and recommendations and generally went along with them. In particular, she took note of Dr. King's diagnosis of probable nerve entrapment and followed a treatment plan consistent with that diagnosis.

In sum, there is no evidence in the record to support Plaintiff's claim that Dr. Gedney acted with deliberate indifference, *i.e.,* that she knew of and disregarded an excessive risk to Plaintiff's health. Therefore, summary judgment should be granted in her favor.

### c. John Peery

With respect to defendant Peery, Plaintiff alleges that he filed medical kites every day asking for help for his pain, but they were intercepted by defendant Peery, who failed to pass them along to doctors or otherwise render any assistance. (Doc. # 38 at 7 ¶ 7 and 8 ¶ 13.) He also asserts that he filed a grievance regarding the medical department's refusal to see him on September 20, 2010, but claims it was denied by defendants Peery and Bannister. (*Id.* ¶ 8.)

Plaintiff further claims that he showed a pill call nurse his swelling, bruising and pain, and the nurse said she would talk to defendant Peery; however, when she returned she said defendant Peery told her Plaintiff would have to "tough it out." (*Id.* at 8 ¶ 9.)

Plaintiff's allegations that defendant Peery ignored or failed to pass along his medical requests or otherwise provide him with care are also belied by the medical evidence presented to the court. The medical records do not reflect deliberate indifference on the part of Nurse Peery; rather, they indicate that Plaintiff received continual and responsive care during this time period.

After arriving to NNCC, Plaintiff saw Dr. Mar on April 15, 2010, and was referred for surgery. (Doc. # 55-1 at 6; Doc. # 55-2 at 3, 27.) He was scheduled to see a surgeon, and was

1   given pain medical from April through June 2010. (Doc. # 55-1 at 10; Doc. # 55-2 at 27.) In July,

2   Dr. Mar ordered that Plaintiff proceed with surgery, which occurred at the end of the month.

3   (Doc. # 55-2 at 28.) Plaintiff was then admitted to the infirmary (Doc. # 55-1 at 10; Doc. # 55-2

4   at 28), and was seen by both physicians and nursing staff in August 2010 following complaints

5   of pain. (Doc. # 55-2 at 3-8, 28-29, 36; Doc. # 55-3 at 6.) He was also prescribed various

6   medications. (*Id.*) In fact, he was seen by either a doctor or nursing staff nearly every day in

7   August 2010. (*Id.*)

8        In early September 2010, when he made complaints of pain, he was promptly seen by

9   medical staff. (Doc. # 55-2 at 8-10, 27, 29-31, 36-37.) Various tests were ordered and medication

10  prescribed. (*Id.*) When he complained of pain again in mid-September, a urinalysis was

11  requested and Plaintiff refused. (*Id.*) Nevertheless, he was scheduled for a follow-up appointment

12  with his surgeon. (*Id.*) He was also prescribed pain medication. (Id) He was subsequently seen by

13  both Dr. Gedney and Dr. King.

14       Plaintiff continued to receive care from medical staff consistently from October through

15  December 2010 and into January and February of 2011. (Doc. # 55-2 at 10-11, 29-31; Doc. # 55-

16  3 at 4, 6.) He saw not only nursing staff and NDOC physicians, but outside physicians as well.

17  (*Id.*) He was prescribed a variety of medication to address his ongoing complaints of pain and all

18  of his complaints were promptly reviewed. (*Id.*)

19       Therefore, Plaintiff's claim that defendant Peery somehow refused to allow Plaintiff to

20  obtain medical attention or in some manner obfuscated his complaints is not tenable. Summary

21  judgment should be granted in favor of defendant Peery as to this claim.

22                       **d. Dr. Johns**

23       Plaintiff saw Dr. Johns on October 6, 2010, and alleges that she said she would prescribe

24  him something for his pain. (Doc. # 38 at 8 ¶ 11.) When the medication arrived the following

25  day, he claims it was a seizure medication to which Plaintiff asserts he has an allergy. (*Id.* ¶ 12.)

26  He was also given Tylenol. He claims he took the medication but it had no effect on his pain.

27  (*Id.*)

28       There is no evidence that Dr. Johns, in prescribing Plaintiff  medication, *knew of and*

*disregarded* a significant risk to Plaintiff's health. There is no indication that Dr. Johns knew Plaintiff had an allergy to any drug. Instead, Plaintiff's medical records reveal that Plaintiff was evaluated by Dr. Johns on October 6, 2010, and was assessed with post-operative pain and nerve entrapment. Her progress notes state that Plaintiff indicated a willingness to try "Tigerton" (which Plaintiff has called Tegratol) for nerve pain. (Doc. # 55-2 at 10, 30; Doc. # 55-3 at 4, 6.) The same notes indicate that Plaintiff was also being prescribed Naprosyn, but he subsequently indicated to nursing that he had an allergy to *this* drug. (Doc. # 55-2 at 10, 30.) As soon as the allergy to Naprosyn was made known, Dr. Johns discontinued the order for the drug and notated the allergy in his chart. Plaintiff did subsequently report to medical with complaints of hives and itching (Doc. # 55-2 at 38), but there is simply no evidence that Dr. Johns knowingly prescribed him a drug to which he had an allergy, in disregard of a significant risk to his health. In addition, when he reported having a reaction to this drug, he was informed by medical staff that he could refuse it. (Doc. # 58-2 at 29.) When Plaintiff reported difficulties he was having while taking this medication, Dr. Gedney took him off the medication and prescribed him a new medication to address the pain caused by the probable nerve entrapment. (Doc. # 55-2 at 10-11, 30.)

There is no evidence that Dr. Johns knew of and disregarded an excessive risk to Plaintiff's health in violation of the Eighth Amendment. As a result, summary judgment should be entered in Dr. Johns' favor on this claim.

### e. Dr. Bannister

Plaintiff claims he filed a grievance on September 20, 2010, regarding the medical department's refusal to see him, but it was denied by Dr. Bannister and Nurse Peery. (Doc. # 38 at 7 ¶ 8.) In addition, when Plaintiff saw his surgeon, Dr. King, on February 14, 2011, he asserts that he was told Dr. Bannister would not approve Plaintiff for pain treatment. (*Id.* at 8 ¶ 15.) Finally, he alleges that he wrote to Dr. Bannister requesting assistance, but Dr. Bannister refused to give Plaintiff medical attention. (*Id.* at 9 ¶ 17.)

The court has carefully reviewed the evidence presented, which demonstrates that extensive medical care was provided to Plaintiff between April 2010 and February 2011. In light of this evidence, Plaintiff cannot maintain his contention that Dr. Bannister knew of and

1    disregarded a risk to his health in denying his grievances. Nor can it be said that Dr. Bannister

2    precluded Plaintiff from obtaining medical care.

3         Plaintiff did not provide the court with a copy of the letter he purportedly sent to

4    Dr. Bannister, but did provide Dr. Bannister's response on November 22, 2010, where

5    Dr. Bannister stated that he would notify NNCC's medical department of Plaintiff's concerns and

6    instructed Plaintiff to kite to be seen to discuss his medical issues with his practitioner at NNCC.

7    (Doc. # 58-3 at 7.)

8         Plaintiff also did not provide the court with a copy of his January 6, 2010 letter to

9    Dr. Bannister, but did provide Dr. Bannister's January 20, 2010 response, where Dr. Bannister

10   stated that he would forward Plaintiff's concerns to NNCC's medical department and ask them to

11   ensure Plaintiff was evaluated. (Doc. # 58-3 at 6.)

12        The documentation demonstrates that Dr. Bannister responded promptly and

13   appropriately to Plaintiff's concerns and forwarded them on to his health care providers at NNCC

14   so they could provide him with evaluation and treatment. It does not illustrate the knowing

15   disregard of an excessive risk to Plaintiff's health.

16         Therefore, summary judgment should be granted in Dr. Bannister's favor as to this claim.

17                              **f. Nurse Reeves**

18        Plaintiff alleges that on September 12, 2010, he called a "man down" due to intense pain

19   he was experiencing; however, defendant Reeves, the nurse on duty, refused to come to his unit.

20   (Doc. # 38 at 7 ¶ 5.) He asserts that he made a second "man down" call and defendant Reeves

21   finally came to his unit. (*Id.*) Plaintiff avers that before he came to the unit, Nurse Reeves told

22   him that Dr. Mar had said Plaintiff would not receive any care. (*Id.*) Finally, Plaintiff claims that

23   Nurse Reeves yelled at him that it was his fault he was in pain because he was not wearing

24   special post-operative underwear, which Plaintiff claims he was never prescribed. (*Id.*)

25        Plaintiff's medical records include an unusual occurrence report dated September 12,

26   2010, indicating that Plaintiff complained of severe abdominal pain and blood in his urine. (Doc.

27   # 58-2 at 27; Doc. # 55-2 at 37.) The report further states that a urine sample was requested, but

28   Plaintiff refused. (*Id.*) On that date, he was ordered Tylenol every six hours for pain, as needed.

1    (Doc. # 55-2 at 29.) He was scheduled for a follow-up with his surgeon that week. (*Id*.)

2           Even if it is true that Nurse Reeves did not report to Plaintiff's cell until the second "man

3    down" was called, there is no evidence that Nurse Reeves was deliberately indifferent to

4    Plaintiff's serious medical need. There is nothing in the record to suggest that Nurse Reeves

5    knowingly failed to respond to the first "man down" call. Instead, the evidence indicates that

6    when Nurse Reeves arrived to Plaintiff's cell he was evaluated for his complaints, refused a

7    urinalysis, was given medication for his pain and scheduled for a follow-up appointment with his

8    surgeon.

9           In the absence of evidence that Nurse Reeves knew of and disregarded an excessive risk

10   to Plaintiff's health, summary judgment should be granted in favor of defendant Reeves as to this

11   claim of deliberate indifference.

12          **4.  March 1-30, 2011—Dr. Koehn**

13                **a. Allegations**

14          Plaintiff claims that on March 17, 2011, he sent a kite regarding his pain, and was not

15   seen until March 24, 2011, by Physician's Assistant Martin, who had Plaintiff moved to the

16   prison infirmary and prescribed pain medication. (Doc. # 38 at 9.) The following day, he

17   contends he was moved to the infirmary and was examined by Dr. Koehn, who cancelled

18   Martin's order for pain medication. (*Id*.) When Plaintiff asked why the pain medication was

19   being cancelled, he claims that Dr. Koehn told him that he would keep Plaintiff in a "strip cell"

20   for a while to see if that made him feel better. (*Id*.) Plaintiff also asserts that Dr. Koehn told him

21   that Plaintiff would have to submit to another genital examination by Dr. Mar if he wanted

22   anything. (*Id*.) That evening, Plaintiff claims he asked the nurse to contact Dr. Mar regarding his

23   pain but he refused, stating that Dr. Koehn declined to give Plaintiff anything. (*Id*.)

24          On March 31, 2011, Plaintiff was sent back to NNCC. (*Id*.)

25                **b. Review of Medical Records and Analysis**

26          A review of Plaintiff's medical records from March of 2011 contravenes Plaintiff's

27   allegations that Dr. Koehn was deliberately indifferent to a serious medical need during this time.

28          After his transfer to ESP, a March 8, 2011, a progress note by nursing indicates Plaintiff

- 19 -

1    was given back his keep-on-person transfer medications, and was given medical handouts for

2    care. (Doc. # 55-2 at 12.) Plaintiff was then seen by nursing on March 13, 2011, with complaints

3    of intermittent migraine headaches, for which he said he obtained some relief with over-the-

4    counter analgesics and NSAIDs, but that he did not have any because he had not gotten all of his

5    property yet. (*Id*. at 13.) He was encouraged to increase his fluids and was issued an ibuprofen

6    pain pack. (*Id*.; Doc. # 55-2 at 31.) He was also instructed to kite if he did not experience relief

7    or wanted further treatment. (Doc. # 55-2 at 13.)

8         Plaintiff sent a kite on March 17, 2011, stating that he had been experiencing pain since

9    his surgery. (Doc. # 58-2 at 33.) He was told he would be scheduled to see a provider regarding

10   the issue, and was seen on March 24, 2011. (Doc. # 58-2 at 33; Doc. # 55-2 at 13.) At that time,

11   he described his severe groin pain associated with his inguinal hernia repair. (*Id*.) The provider

12   noted Plaintiff appeared in discomfort. (*Id*.) His abdomen was stated to be non-tender;

13   nonetheless, Plaintiff rated his right groin pain as an eight or nine on a scale of one to ten. (*Id*.)

14   The provider also included a notation that the right inguinal hernia was well-healed. (*Id*.)

15   Plaintiff was described as: "Guarding severe pain with light palpation of right inguinal hernia

16   incisional line" which Plaintiff described as an "electric shock" through the groin and down his

17   right leg. (*Id*.) It was recommended, among other things, that Plaintiff be referred to Dr. King for

18   evaluation of the hernia site and that he be prescribed oxycodone and Tylenol, as needed, for

19   seven days, and that he follow up with Dr. Koehn. (*Id*. at 13-14; Doc. # 5-2 at 31-32.)

20        Plaintiff saw Dr. Koehn on March 25, 2011, for complaints of right lower quadrant pain

21   from the site of his hernia repair. (Doc. # 55-2 at 14.) Plaintiff told Dr. Koehn that Dr. King had

22   informed him of possible nerve entrapment. (*Id*.) Dr. King mentioned improvement of pain with

23   injection of lidocaine, which Dr. Koehn acknowledged indicated possible nerve entrapment. (*Id*.)

24   Dr. Koehn noted Plaintiff had reported excruciating pain, but noted: "patient is known for

25   manipulation and 'gaming the system.'" (*Id*.) An examination revealed Plaintiff's abdomen was

26   tender in the right, lower quadrant. (*Id*.) Dr. Koehn's assessment stated: "Nerve entrapment

27   versus malingering/manipulation. Mechanism of pain sited by inmate is valid, but degree of pain

28   is not. Patient became argumentative when interview was terminated. Patient walked out of room

1  with no impairment." (*Id.*)

2      An unusual occurrence report of the same date states that Plaintiff punched a door with

3  his left hand causing injury, and they planned to transfer him to the emergency room for further

4  evaluation. (Doc. # 55-2 at 38.) While in the ESP infirmary, Plaintiff refused an ice pack and

5  asked for pain medication. (Doc. # 55-2 at 14-15.) The time frame for medication was explained

6  to him, and he was described as becoming upset and stating that ibuprofen would not help. (*Id.* at

7  15.) Dr. Koehn discontinued oxycodone and prescribed Motrin with each meal for thirty days.

8  (Doc. # 55-2 at 31.)

9      The following day, Plaintiff reported to nursing that he was "in the worst pain [he had]

10 ever been in, in [his] life. I am calling a man down. I do not know what else to do." (Doc. # 55-2

11 at 15.) He spoke with the nurse and agreed to try the Motrin ordered by the doctor, and it was

12 stated that he would continue to be monitored for increased pain. (*Id.*)

13     Plaintiff was seen again that day at his cell door, complaining of severe pain to his left

14 hand. (*Id.*) A call was placed to Dr. Koehn who concurred with the treatment plan to order

15 Oxycodone every six hours as needed. (*Id.*; Doc. # 55-2 at 31.)

16     Thus, even though Dr. Koehn initially cancelled the order for narcotic pain medication in

17 favor of non-narcotic medication, he re-instated it when Plaintiff continued to complain

18 regarding his pain the following day.

19     On March 27, 2011, Plaintiff requested and was given pain medication. (Doc. # 55-2 at

20 15.) He was seen again by nursing on March 28, 2011, for complaints of pain in his left hand.

21 (*Id.* at 16.) He was taught about routine care for his injury, and was noted as being compliant

22 with his medication which made him feel better. (*Id.*) He did not complain of groin pain at that

23 time. (*Id.*) He was noted as being agitated and refused medication later in the day, but then

24 calmed down and was issued his oral medication. (*Id.*)

25     Plaintiff saw Dr. Koehn later on March 28, 2011, at his cell door, and Dr. Koehn

26 attempted to discuss pain management, but Plaintiff became argumentative. (*Id.*)

27     On March 29, 2011, Plaintiff saw Dr. Koehn at his cell door and discussed transfer to the

28 RMF for evaluation of neuropathic pain. (Doc. # 55-2 at 17.) Plaintiff demanded opiates

although Dr. Koehn informed him that this class of medication was inappropriate for his type of pain. (*Id.*) In addition, Dr. Koehn stated that Plaintiff had refused his Oxycodone the day before and then requested more. (*Id.*) Dr. Koehn ordered that Plaintiff be transferred to NNCC for evaluation, assessed him as malingering, and said he would not be given opiates at that time. (*Id.*; Doc. # 55-2 at 31.)

When Plaintiff complained of pain again on March 30, 2011, Dr. Koehn prescribed him Toradol for his "near term pain," but stated that no opiates would be permitted at that time. (Doc. # 55-2 at 18, 31.)

Plaintiff's conclusory allegations, unsupported by evidence, that Dr. Koehn declined to do *anything* for his pain in March of 2011, and was deliberately indifferent to Plaintiff's serious medical needs are directly refuted by Plaintiff's medical records. First, Plaintiff was seen by medical staff at ESP numerous times during this month. Dr. Koehn evaluated Plaintiff for his complaints of pain on various occasions, and prescribed him several medications, including narcotic and non-narcotic drugs. He ultimately decided that Plaintiff may be malingering and that he exhibited drug-seeking behavior, and declined to offer narcotic pain medication. In the place of narcotic pain relievers, he offered various alternatives and then referred Plaintiff to NNCC's RMF for further evaluation. There is simply no evidence that Dr. Koehn knew of and disregarded a serious risk to Plaintiff's health. To the extent Plaintiff expresses a disagreement as to the course of action chosen by Dr. Koehn, he has not produced any evidence to suggest that Dr. Koehn's treatment was medically unacceptable under the circumstances or chosen in conscious disregard of an excessive risk to Plaintiff's health.  Therefore, summary judgment should be granted in favor of Dr. Koehn as to this claim.

**5. March 31, 2011 to August 8, 2011—Dr. Gedney, Dr. Johns, John Peery, Sharon Koster**

After he was returned back to NNCC on March 31, 2011, Plaintiff contends that Dr. Gedney, Dr. Johns, John Peery and Sharon Koster were deliberately indifferent to his serious medical needs.

A review of Plaintiff's medical records for this time period, however, contains no

evidence of deliberate indifference. Instead, Plaintiff received continual care and monitoring of his medical condition. He received medication deemed appropriate by his doctors, was seen for follow-up care by his surgeon, and was referred to an outside pain specialist. While Plaintiff alleges that his NDOC physicians ignored the specialist's recommendations or made statements that Plaintiff was not to receive any care, these allegations are unsupported by the medical evidence. In fact, it appears from the medical records that Plaintiff's NDOC physicians were advised of the specialist's recommendations and followed them as Plaintiff underwent injections and other forms of nerve therapy to address his complaints of chronic pain.

Plaintiff asserts that he saw Dr. Johns on April 12, 2011, and asked for pain medication but was told he could only receive a higher dose of blood pressure medication. (Doc. # 38 at 9.)

When Dr. Johns saw Plaintiff on April 12, 2011, she examined him and scheduled him with Dr. King for a possible referral for an injection and increased his blood pressure medication dosage. (Doc. # 55-3 at 4; Doc. # 55-2 at 32-33.) He was then seen at the surgical clinic on April 25, 2011. (Doc. # 55-2 at 19.) He sent a kite on April 27, 2011, stating that the Tylenol he received was having no effect on his level of pain and asked that he be given something else. (*Id*.) In response, he was told that he would be referred to a pain specialist for their recommendation. (*Id*.) Thus, Dr. Johns did not disregard a serious risk to his health when she declined to give him something other than Tylenol in April 2011. Instead, his request was taken into consideration when he was referred to a pain specialist who could evaluate his needs and pain management.

Next, Plaintiff contends that he saw Dr. King on April 25, 2011, and asked for pain relief, but Dr. King told Plaintiff he was only a "consultant" and could only make recommendations, and Dr. Gedney did not want him to receive pain medication. (*Id*.) This bare allegation is controverted by the fact that Dr. Gedney prescribed Plaintiff a variety of pain medications over the course of time to address his complaints of pain and referred Plaintiff to the pain specialist.

Plaintiff then asserts that he continued to send kites regarding his pain, and defendant Peery responded to them but refused to give him anything. (*Id*.) This allegation is belied by Plaintiff's medical records which indicate that Plaintiff received extensive care and monitoring as

1    well as medication during this period of time. (*See* Doc. # 55-3 at 4-6; Doc. # 55-2 at 19-22, 33-

2    34, 38; Doc. # 58 at 29.)

3         On May 5, 2011, Plaintiff alleges that he was still in pain and called a "man down." (*Id.*)

4    He says that the nurse came and told Plaintiff the doctors did not care about his pain level, and

5    that the nurse had been advised by Dr. Gedney and Dr. Johns that Plaintiff could only have

6    ibuprofen or Tylenol. (*Id.*)

7         On the same date, Plaintiff avers that when officers were escorting him to the shower he

8    experienced pain in his back and legs which caused him to drop to the tier, unable to get up. (*Id.*)

9    The officers called an emergency "man down" and requested immediate medical care. (*Id.*)

10   Plaintiff alleges that the nurse, defendant Koster, waited thirty minutes to arrive to the unit,

11   allowing Plaintiff to lie on the tier in agony. (*Id.*) He claims she brought a bottle of ibuprofen,

12   and told Plaintiff the doctors told her not to bring it because Plaintiff was "faking it." (*Id.*) She

13   then set the medication down and left Plaintiff lying on the tier. (*Id.*) He contends that the

14   officers carried him to the mental health unit. (*Id.*) The nurse in the unit took his vitals and read

15   them to Dr. Gedney, Dr. Johns, and John Peery, and the nurse told Plaintiff these defendants said

16   to do nothing for Plaintiff. (*Id.*)

17        Plaintiff's conclusory allegation that defendant Koster delayed arrival to Plaintiff's unit is

18   unsupported by the record, and there is no evidence that Nurse Koster *knowingly* waited to arrive

19   at Plaintiff's cell, in conscious disregard of a serious risk to Plaintiff's health. Rather, Plaintiff's

20   medical records reflect that when the nurse arrived after Plaintiff called a "man down," he

21   refused ibuprofen and Tylenol. (Doc. # 5-2 at 38.) There is similarly no evidence that the

22   decision to give Plaintiff only ibuprofen (as opposed to some other type of pain medication) was

23   medically unacceptable under the circumstances or was a decision made in conscious disregard

24   of an excessive risk to Plaintiff's health.

25        Plaintiff asserts that he saw Dr. Johns on June 6, 2011, and Dr. Johns asked Plaintiff if he

26   saw Dr. Mar on June 3, 2011. (*Id.*) Plaintiff told her he had not, and alleges that Dr. Johns told

27   Plaintiff Dr. Mar had ordered the drug Neurontin. (*Id.*) Plaintiff claims he is allergic to this drug,

28   and that Dr. Mar was trying to hurt him by ordering this medication. (*Id.*) Absent from the

record, however, is any evidence that this medication was *knowingly* prescribed to Plaintiff in order to cause him harm. Moreover, Plaintiff's medical records indicate that Dr. Johns discontinued the Neurontin prescription on June 6, 2011, "because it was not tolerated in the past." (Doc. # 55-2 at 34.)

On June 16, 2011, Plaintiff saw pain specialist Dr. Grimes, whom Plaintiff claims "apologized over and over and said that this is not how it is normally done." (*Id*. at 11.) Plaintiff asserts Dr. Grimes knew Plaintiff's pain was more extensive than the prison had told him. (*Id*.) He further asserts that Dr. Grimes told him the prison would not allow Plaintiff to see him a second time, and that the prison medical director told Dr. Grimes not to give Plaintiff anything for his pain. (*Id*.)

The medical records from Dr. Grimes, however, have no reference to the assertions Plaintiff attributes to NDOC doctors. (Doc. # 58 at 29-31.) Instead, he was assessed and the plan was to treat him with "facet joint rhizolysis" and with injections and he was to be given a trial of Lyrica. (*Id*.) In addition, a procedure was performed in Dr. Grimes' office to address Plaintiff's complaints of pain. (*Id*.) When Dr. Gedney saw Plaintiff on June 20, 2011, she made a note that Dr. Grimes had suggested Lyrica, and stated that she would have Plaintiff discuss this with Dr. Johns. (*Id.;* Doc. # 55-2 at 34.)  On June 22, 2011, Dr. Johns noted that she did discuss Dr. Grimes' recommendation of Lyrica, and the fact that Plaintiff had not tolerated similar medications in the past. (Doc. # 55-2 at 21; Doc. # 55-3 at 5.) Plaintiff declined Lyrica and asked for narcotics. (*Id*.) Dr. Johns indicated she would contact Dr. Grimes to discuss further options. (*Id*.) She noted that Plaintiff had refused his blood pressure medication. (*Id*.) Dr. Johns then indicated that she spoke to Dr. Grimes, who recommended treatment for functional low back pain, with the only other option being an epidural block which may or may not work. (*Id*.) Dr. Johns prescribed Plaintiff Baclofen (a muscle relaxant) and ibuprofen three times a day for fourteen days. (Doc. # 55-2 at 34; Doc. # 55-3 at 6.)

Plaintiff alleges that he continued to be in pain, but Dr. Gedney and Dr. Johns refused to give him pain medication. (*Id*.) He claims that on approximately June 23, 2011, he fell and started to lose his ability to stand, and started shaking and having numbness. (*Id*.) He contends he

- 25 -

saw a neurologist who said this was caused by blood pressure spokes as a result of untreated pain. (*Id.*)

Plaintiff's medical records reflect that Plaintiff saw Dr. Johns again on June 27, 2011. (Doc. # 55-2 at 21; Doc. # 55-3 at 5.) Nursing noted he was refusing all medications. (Doc. # 55-3 at 5.) Plaintiff reported he refused to take them because he experienced numbness he thought might have been caused by the medication. (*Id.*) Dr. Johns stated that Plaintiff "has unusual pain/parathesia problems which don't make anatomical sense." (*Id.*) She decided to consider a "neuro eval/start." (*Id.*) She ordered an EKG and scheduled Plaintiff with Dr. Gedney for a "neuro opinion." (Doc. # 55-2 at 34; Doc. # 55-3 at 6.)

Plaintiff refused his medication on and off for seven days in early July 2011. (Doc. # 55-2 at 21.)

Plaintiff saw Dr. Gedney on July 7, 2011. (Doc. # 55-2 at 22.) She assessed him as having "[n]eurologic problems separated by time and space" and stated she would advise him to have an MRI of his head to rule out multiple sclerosis. (*Id.*; Doc. # 55-2 at 34.) She also ordered that he be scheduled to see Dr. Jensen the following week to rule out multiple sclerosis and to assess his optic discs. (Doc. # 55-2 at 34.) He continued to be monitored. (*Id.* at 22, 34.)

On August 9, 2011, Plaintiff was moved back to ESP. (*Id.*)

Plaintiff's allegations against Dr. Gedney, Dr. Johns, John Peery and Nurse Koster are unsubstantiated. The record demonstrates that Plaintiff received appropriate and continual care and monitoring for his complaints of pain and neurological issues from the end of March 2011 through the beginning of August 2011. There is no evidence that these defendants knew of and disregarded an excessive risk to Plaintiff's health. Therefore, summary judgment should be granted in favor of defendants Dr. Gedney, Dr. Johns, John Peery and Nurse Koster as to this claim.

### 6. August 9, 2011 to January 30, 2012—Dr. Koehn and Dr. Mar

#### a. Plaintiff's Allegations

After he returned to ESP on August 9, 2011, Plaintiff alleges that he saw Physician's Assistant Martin on August 22, 2011. (Doc. # 38 at 11.) Plaintiff avers that Martin told him he

1   would submit Plaintiff to return to NNCC to finish his treatment with the pain specialist, and

2   prescribed him pain medication which was cancelled by Dr. Koehn. (*Id.*)

3          Plaintiff then contends that he saw Dr. Koehn on November 7, 2011, and Plaintiff claims

4   that Dr. Koehn agreed at that time that Plaintiff should not have been given blood pressure

5   medication for pain treatment. (*Id.*) He asserts that Dr. Koehn said Plaintiff should submit to

6   another examination by Dr. Mar. (*Id.*)

7          Plaintiff alleges he saw Dr. Mar on November 29, 2011, and Dr. Mar told him he would

8   not be permitted further visits with the pain specialist. (*Id.* at 12.) He also claims Dr. Mar told

9   him to do stretches for his disc disease, but would not give Plaintiff anything for his pain. (*Id.*)

10          Plaintiff claims he sent multiple kites asking for a "rubber donut" or pad and double

11   mattress to relieve his tailbone pain, which was made worse by sitting on hard surfaces and lying

12   down. (*Id.*) Plaintiff contends the warden was going to provide these items; however, Dr. Koehn

13   told the warden not to give Plaintiff anything to alleviate his pain. (*Id.*)

14          Next, Plaintiff asserts that he sent kites that his pain was getting worse, beginning on

15   December 25, 2011. (*Id.*) He was told he would be scheduled with a provider, but was not seen

16   for over a month. (*Id.*) During this time, he claims he continued to experience pain and fell down

17   several times. (*Id.*)

18          Plaintiff alleges that on January 14, 2012, Physician's Assistant Martin arrived in the unit

19   for sick call, but told Plaintiff Dr. Koehn had restricted him from seeing Plaintiff. (*Id.*)

20          Plaintiff claims that he finally saw Dr. Koehn on January 30, 2012, and without

21   examining Plaintiff, Dr. Koehn said he wanted to read a report from Plaintiff's medical file which

22   included a note by Correctional Officer Bradley stating that Plaintiff could make his back

23   condition worse by engaging in "horse play." (*Id.*) For this reason, Dr. Koehn told Plaintiff he

24   would not provide care for Plaintiff's liver or back pain. (*Id.*)

25                       **b. Plaintiff's Medical Records and Analysis**

26          Plaintiff's medical records reveal that after he arrived at ESP on August 9, 2011, he was

27   seen by Dr. Koehn at his cell on August 10, 2011, and Dr. Koehn discussed his care at the RMF.

28   (Doc. # 55-2 at 23, 35.) The following day, he requested Tylenol and was given the medication

1    to be taken as needed every four to six hours. (*Id.*) On August 12, 2011, a nursing progress note

2    entry stated that Plaintiff's medications from NNCC would be refilled. (*Id.*)

3            Plaintiff was next seen on August 22, 2011, for complaints of groin pain. (*Id.*) The

4    provider noted that he had recently been seen by Dr. Grimes for pain management, but reported

5    no relief. (*Id.*) The provider acknowledged Plaintiff's history of right inguinal hernia repair and

6    possible nerve impingement, and indicated that he appeared in discomfort. (*Id.*) He was referred

7    to Dr. Koehn for pain management and was to be given Lyrica. (*Id.* at 24, 35.) He was then seen

8    in the specialty clinic for hypertension. (*Id.*)

9            Plaintiff's vitals were taken on September 7, 2011, and he saw Dr. Koehn on

10   September 12, 2011. (*Id.*) He saw Dr. Koehn again on October 12, 2011, but his pain was not

11   among the items noted in the progress notes. (*Id.* at 24-25.) He was prescribed Lyrica again on

12   September 16, 2011. (*Id.* at 35.) His vitals were taken by nursing again on October 27, 2011. (*Id.*

13   at 25.) Plaintiff was then seen by Dr. Koehn on November 7, 2011, and his Lyrica dosage was

14   increased. (*Id.* at 25, 35.)

15           On November 9, 2011, he filed a kite stating that he had been experiencing stomach pain;

16   however, the kite response indicates Plaintiff was seen by Dr. Koehn on November 22, 2011 and

17   by Dr. Mar on November 29, 2011. (*Id.*) He was instructed that to kite again to be seen by a

18   medical provider if his issues had not been addressed in those visits. (*Id.*)

19           On November 18, 2011, Plaintiff sent a kite asking what the treatment plan was for his

20   disc disease and back pain, and was told the plan was to "manage pain in a responsible manner."

21   (Doc. # 58-2 at 45.)

22           Plaintiff saw Dr. Koehn on November 22, 2011, for complaints of back, groin and

23   stomach pain. (Doc. # 55-2 at 25.) Dr. Koehn noted that Dr. Grimes had identified positive

24   lumbosacral and sacroiliac pain. (*Id.*) Dr. Koehn referred Plaintiff to Dr. Mar for consideration of

25   a return to a pain specialist. (*Id.*) He was continued on Lyrica. (*Id.* at 35.)

26           On November 23, 2011, Plaintiff sent a kite asking for a "rubber donut" to sit on as well

27   as a double mattress. (Doc. # 58-2 at 36.) Plaintiff was advised to kite the warden for these items.

28   (*Id.*) Plaintiff sent another kite requesting a "rubber donut" on November 29, 2011. (Doc. # 58-2

at 71.) In response, he was told that Dr. Koehn had determined that these items were not medically necessary. (*Id*.)

Plaintiff filed additional kites on December 18 and 25, 2011, referencing Dr. Koehn's determination these items were not medically necessary, and stated that his pain was getting worse. (Doc. # 58-2 at 34, 37.) In response, he was told that he would be scheduled to see a provider regarding this issue. (*Id*.)

Plaintiff filed a grievance in January 2010, referencing chronic pain caused by disc disease and hepatitis C. (Doc. # 58-1 at 57.) In response he was told: "Our providers have been diligent in their efforts to help you. You have been prescribed several medications in our efforts to give you relief. Each time you report you have no relief yet your med sheets reflect days and days of refusals of your medications. Under the circumstances it would be expected that you wouldn't get relief. [sic] from your medications." (*Id*.) Plaintiff responded that he had only been prescribed Lyrica and he took it for over three months and stopped taking it because it was not working. (*Id*.) He was instructed to kite to be seen if he felt that he needed additional care. (*Id*.)

Another grievance filed in January reflects that Plaintiff had been provided medical care on January 1, 5, and 7, 2012, and that Plaintiff had refused admission to the infirmary for observation. (Doc. # 58-1 at 56.)

Plaintiff was documented as refusing Lyrica on January 24 and 29, 2012. (Doc. Doc. 55-2 at 26.) Dr. Koehn saw Plaintiff on January 30, 2012, and confronted Plaintiff with the fact that he was documented wrestling in his cell and that he was refusing Lyrica. (*Id*.) Dr. Koehn reported that Plaintiff became abusive and the interview was terminated. (*Id*.) Plaintiff refused Lyrica again that day. (*Id*.) Plaintiff filed a grievance, stating that Dr. Koehn was refusing to provide him with medical care. (Doc. # 58-2 at 91-92.) In response, he was told that the appointment was terminated because Plaintiff had become verbally abusive when confronted with allegations of wrestling and refusing medication. (*Id*. at 90.)

Plaintiff's medical records controvert his bare allegations that either Dr. Koehn or Dr. Mar was deliberately indifferent to his serious medical needs during this time period. Instead, Plaintiff merely raises a difference of opinion with the course of treatment chosen by his

physicians. Specifically, Plaintiff disagrees with the decision to withhold narcotic pain medication. However, Plaintiff's physicians tried alternative methods of alleviating Plaintiff's pain, including non-narcotic medication, even though they expressed a belief that Plaintiff exhibited drug-seeking behavior. There is no evidence that this course of conduct was medically unacceptable under the circumstances or that it was chosen in conscious disregard of an excessive risk to Plaintiff's health. The evidence suggests that the medical staff was responsive to Plaintiff's complaints and strived to balance management of Plaintiff's pain with possible drug-seeking behavior and Plaintiff's documented refusal to take prescribed medication. Nor has argued or presented evidence to demonstrate that the failure to provide him with a "rubber donut" or another mattress posed a serious risk to his health or that such items were medically indicated. With no evidence to demonstrate that Dr. Koehn or Dr. Mar knew of and disregarded an excessive risk to Plaintiff's health, summary judgment should be granted in favor of these defendants as to this claim of deliberate indifference.

**D. Official Capacity Damages Claims**

As a result of the court's recommendations above, the argument regarding official capacity damages need only be analyzed with respect to Plaintiff's claim of sexual misconduct against Dr. Mar.

A civil rights action may be brought against state actors in either their official or individual capacities. An action against a government official in his or her official capacity is not a suit against the individual, but rather a suit against the official's office. *Will v. Michigan Dept. of State Police*, 491 U.S. 58 (1989); *Kentucky v. Graham*, 473 U.S. 159 (1985). "[F]ederal courts are barred by the Eleventh Amendment from awarding damages against state officials acting in their official capacities[.]" *Snow v. McDaniel*, 681 F.3d 978, 991 (9th Cir. 2012) (citing *Bank of Lake Tahoe v. Bank of America*, 318 F.3d 914, 918 (9th Cir. 2003)).

Therefore, Plaintiff should not be permitted to maintain a claim for damages against Dr. Mar in his official capacity.

///

///

## IV. RECOMMENDATION

**IT IS HEREBY RECOMMENDED** that the District Judge enter an Order as follows:

(1) **DENYING** Plaintiff's request to defer consideration of Defendants' motion under Federal Rule of Civil Procedure 56(d); and

(2) **GRANTING IN PART AND DENYING IN PART** Defendants' Motion for Summary Judgment (Doc. # 54) as follows:

(a) The motion for summary judgment should be **DENIED** as to Plaintiff's claim that Dr. Mar violated the Eighth Amendment by engaging in alleged sexual misconduct on April 15, 2010 and November 29, 2011;

(b) The motion for summary judgment should be **GRANTED** in favor of Dr. Mar, Dr. Gedney, John Peery, Dr. Johns, Dr. Bannister and Shiloh Reeves as to Plaintiff's claim that they were deliberately indifferent to a serious medical need from August 2010 through February 2011;

(c) The motion for summary judgment should be **GRANTED** in favor of Dr. Koehn as to Plaintiff's claim that Dr. Koehn was deliberately indifferent to a serious medical need in March of 2011;

(d) The motion for summary judgment should be **GRANTED** in favor of Dr. Gedney, Dr. Johns, John Peery, and Sharon Koster as to Plaintiff's claim that they were deliberately indifferent to a serious medical need between March 31, 2011 and August 8, 2011;

(e) The motion for summary judgment should be **GRANTED** in favor of Dr. Koehn and Dr. Mar as to Plaintiff's claim that they were deliberately indifferent to a serious medical need between August 9, 2011 and January 30, 2012; and

(f) Plaintiff should not be permitted to seek damages against defendant Dr. Mar in his official capacity.

///

///

///

///

The parties should be aware of the following:

1. That they may file, pursuant to 28 U.S.C. § 636(b)(1)(C), specific written objections to this Report and Recommendation within fourteen days of receipt. These objections should be titled "Objections to Magistrate Judge's Report and Recommendation" and should be accompanied by points and authorities for consideration by the district judge.

2. That this Report and Recommendation is not an appealable order and that any notice of appeal pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure should not be filed until entry of judgment by the district court.

DATED: June 25, 2014.

WILLIAM G. COBB
UNITED STATES MAGISTRATE JUDGE